THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| TERA SHANLEY a/k/a T.S. JOYCE and WICKED WILLOW PRESS, LLC, a Texas limited liability company,<br><br>     Plaintiffs,<br><br>v.<br><br>ROBYN A. HUTCHINGS a/k/a TERRY BOLRYDER a/k/a DOMINO SAVAGE,<br><br>     Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART [64] PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:22-cv-00549-DBB-JCB<br><br>District Judge David Barlow |

On August 29, 2022, Plaintiffs Tera Shanley and her publishing company Wicked Willow Press, LLC ("Wicked Willow") sued Defendant Robyn A. Hutchings for defamation per se, defamation, injurious falsehood, false light, tortious interference, and intentional infliction of emotional distress.[1] Now, Plaintiffs move for summary judgment.[2] Ms. Hutchings did not respond to Plaintiffs' Motion. For the reasons that follow, the court grants Plaintiffs' motion in part.

**BACKGROUND**

This case arises from voluminous statements Ms. Hutchings posted on various social media platforms concerning Ms. Shanley. Both Ms. Shanley and Ms. Hutchings are writers who primarily publish paranormal romance fiction novels.[3] Ms. Shanley writes under her given name

---

[1] Compl. ¶¶ 58–106, ECF No. 2.
[2] Pls.' Mot. for Summ. J., ECF No. 64.
[3] Decl. of Tera Shanley in Supp. of Pls.' Mot. for Summ. J. ("Shanley Decl.") ¶¶ 5, ECF No. 66-1; Answer ¶ 4, ECF No. 17.

along with a penname, T.S. Joyce.[4] Ms. Hutchings publishes under pennames Terry Bolryder and Domino Savage.[5]

From around early July 2022 to at least August 29, 2022,[6] Ms. Hutchings made hundreds of social media posts on various platforms accusing Ms. Shanley of various acts, including: rape, child sexual abuse, human trafficking, adultery, sexual coercion, blackmail, white supremacy, plagiarism, and abusing fans.[7] Specifically, Ms. Hutchings explicitly accused Ms. Shanley of rape or rape of a child at least 13 times[8] and alluded to such acts at least another 10 times.[9] Ms. Hutchings then accused Ms. Shanley of human trafficking at least twice[10]; adultery, "homewrecking," or "coercion" at least six times[11]; plagiarism at least three times[12]; white supremacy at least once[13]; stalking at least once;[14] and being abusive at least twice.[15]  Ms. Hutchings claimed to have proof of her accusations on several occasions.[16]

More generally, Ms. Hutchings simply harassed and insulted Ms. Shanley.[17] And on several occasions, Ms. Hutchings alluded to physically harming Ms. Shanley.[18] Indeed, Ms.

---

[4] Shanley Decl. ¶ 5.
[5] Answer ¶ 4.
[6] *See* Shanley Decl. ¶ 10 (declaring that she was first informed of the posts on July 11, 2022); Compl. ¶ 16.
[7] *See* Shanley Decl. ¶ 12; *see, e.g.*, ECF No. 64-2, Exs. D–AR. Ms. Hutchings admitted to using the social media handles "Terry Bolryder," "terrybolryder," "@terrybolryder," "Domino Savage," and "@dominosavageauthor." Answer ¶ 15.
[8] ECF No. 64-2, Exh H; *id.* Ex. I; *id.* Ex. J; Ex. L; *id.* Ex. M; *id.* Ex. N; *id.* Ex. O; *id.* Ex. P; *id.* Ex. V; *id.* Ex. W; *id.* Ex. AN; *id.* Ex. AP.
[9] *See id.* Ex. J; Ex. P; *id.* Ex. Q; *id.* Ex. R; *id.* Ex. S; *id.* Ex. T; *id.* Ex. U; *id.* Ex. X; *id.* Ex. Y; *id.* Ex. Z.
[10] *See id.* Ex. AA; *id.* Ex. AB.
[11] *See id.* Ex. AC; *id.* Ex. AD; *id.* Ex. AE; *id.* Ex. AF; *id.* Ex. AG; *id.* Ex. AH.
[12] *See id.* Ex. AI; *id.* Ex. AJ; Ex. AK.
[13] *See id.* Ex. AH.
[14] *See id.* Ex. AH.
[15] *See id.* Ex. AL; *id.* Ex. AR.
[16] *See id.* Ex. D; *id.* Ex. K; *id.* Ex. U.
[17] *See id.* Ex. F; *id.* Ex. G; *id.* Ex. H.; *id.* Ex. I; *id.* Ex. J.; *id.* Ex. K; *id.* Ex. R; *id.* Ex. W; *id.* Ex. AC; *id.* Ex. AM; *id.* Ex. AO.
[18] *See id.* Ex. AN; *id.* Ex. AP.

Hutchings suggested that "she had been planning this for years."[19] Notably, in her Answer, Ms. Hutchings admits to making a number of the posts at issue in Ms. Shanley's Motion.[20] Ms. Shanley has submitted a declaration denying the acts of which Ms. Hutchings accused her.[21]

At the time of the posts, Ms. Hutchings had around 1,500 followers on Instagram and 7,800 on Facebook.[22] In addition, Ms. Shanley has presented evidence of other users interacting with Ms. Hutchings with regard to her statements.[23]

Ms. Shanley has submitted a declaration detailing her economic damages, as well as her emotional damages. Ms. Shanley declares that she has "seen a continuous reduction in [her] book sales" following the posts, and that she was forced to triple the number of hours she worked per month in order to earn a similar living to what she had experienced prior to the onset of Ms. Hutchings' posts.[24] Ms. Shanley declares that her books have also seen a noticeable decrease in popularity following the onset of Ms. Hutchings' posts.[25] And Ms. Shanley declares that she has had serious mental health issues following Ms. Hutchings' accusations and has sought therapy for some time.[26] Finally, Ms. Shanley declares that she experienced significant familial struggles due to Ms. Hutchings' posts.[27]

---

[19] *Id.* Ex. D.
[20] *See* Answer ¶¶ 15, 18, 20–22, 24–29, 31–33, 35, 37, 38 (admitting to making the posts generally, and specifically admitting to making the posts contained in Exhibits AD, AF, AE, AH, AG, AC, H, G, F, J, O, P, K, J, V, I, J, N, R, X, Y, Q, M, Z, AA, AB, AM, AN, and AO).
[21] *See* Shanley Decl. ¶ 13 ("I have never committed any of the horrific acts that Ms. Hutchings has accused me of in her Social Media Posts"); *id.* ¶¶ 14–23.
[22] *See* ECF No. 64, Ex. B (Instagram account with 1,525 followers); *id.* Ex. C (Facebook account with 7,800 followers); Answer ¶ 15 (admitting that Ms. Hutchings' accounts had several thousand followers).
[23] *See* ECF No. 64-2, Ex. M; *id.* Ex. AG; *id.* Ex. AJ; *id.* Ex. AQ; *id.* Ex. AR.
[24] Shanley Decl. ¶¶ 25, 34–36.
[25] *Id.* ¶ 38.
[26] *Id.* ¶¶ 40–41.
[27] *See id.* ¶¶ 43–44.

Ms. Shanley initiated this lawsuit in August 2022, roughly two months after the posts began.[28] Ms. Hutchings answered,[29] but later failed to respond to discovery requests.[30] And at some point, Ms. Hutchings' social media accounts were taken down.[31] Ms. Shanley sought summary judgment on her claims on October 27, 2023.[32] By November 28, Ms. Hutchings had not responded, nor had she contacted the court to request an extension.[33] Thus, the court ordered Ms. Hutchings to respond in writing by December 4, 2023 to inform the court as to whether she intended to respond to Ms. Shanley's Motion.[34] Ms. Hutchings has not responded to either Ms. Shanley's Motion or the court's order. However, Ms. Hutchings did file her own Motion for Summary Judgment earlier in the case,[35] which the court denied without prejudice pursuant to a Ms. Shanley's Rule 56(d) request.[36] The court will consider the arguments that Ms. Hutchings raised in her that motion where appropriate.

## STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence

---

[28] *See* Compl.
[29] *See* Answer.
[30] *See* Memorandum Decision and Order 2–4, ECF No. 59 (describing discovery issues); *see also* Pls.' First Set of Discovery Requests to Def., ECF No. 35-1; Def Robyn A Hutchings A/K/A Terry Bolryder A/K/A Domino Savage's Response to Pls.' First Set of Document Production Requests, ECF No. 35-2.
[31] *See* Shanley Decl. ¶ 32.
[32] *See* Pl.'s Mot.
[33] *See* ECF No. 71.
[34] *Id.*
[35] *See* Def.'s Mot. for Summ. J., ECF No. 32.
[36] *See* Mem. Decision and Order Granting [45] Pls.' Rule 56(d) Mot. and Denying Without Prejudice [32] Def.'s Mot. for Summ. J., ECF No. 51.
[37] Fed. R. Civ. P. 56(a).

presented."[38] In determining whether there is a genuine dispute as to material fact, the court

should "view the factual record and draw all reasonable inferences therefrom most favorably to

the nonmovant."[39] The moving party "bears the initial burden of making a prima facie

demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a

matter of law."[40] Thus, "[i]f the nonmoving party fails to respond, the district court may not

grant the motion without first examining the moving party's submission to determine if it has

met its initial burden of demonstrating that no material issues of fact remain for trial and the

moving party is entitled to judgment as a matter of law."[41] Finally, when the moving party bears

the burden of proof at trial, the "showing must be sufficient for the court to hold that no

reasonable trier of fact could find other than for the moving party."[42]

## DISCUSSION

Ms. Shanley seeks summary judgment on the following claims: defamation; defamation

per se; injurious falsehood; false light; tortious interference; and intentional infliction of

emotional distress. In addition, Ms. Shanley argues that she is entitled to economic and non-

economic compensatory damages, as well as punitive damages. Because several of Ms.

Shanley's claims implicate Ms. Hutchings' speech, the court first addresses whether any

heightened standard applies to Ms. Shanley's claims under the First Amendment.

---

[38] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).
[39] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).
[40] *Id.* at 670–71.
[41] *Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).
[42] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

## I.      First Amendment

The U.S. Supreme Court has held that the First Amendment imposes a barrier to imposing civil liability on speech that is alleged to be tortious.[43] The basic framework is this: if the alleged tortious speech is directed at a public official or public figure,[44] then the plaintiff must prove actual malice—that is, at least reckless disregard for whether the speech was false.[45] And even when the plaintiff is neither a public official nor a public figure, if the speech at issue deals with a matter of public concern, it is protected by the First Amendment.[46] In both instances, the burden is also on plaintiffs to show that the speech at issue is false.[47] Finally, if the speech is directed towards a private person and relates to a matter of private concern, then the First Amendment simply requires some fault—typically at least negligence—be proved by the plaintiff.[48]

Ms. Shanley argues that no heightened standard applies to her claims because she is not a public figure and the alleged defamation is not a matter of public concern.[49] Namely, Ms. Shanley suggests that Ms. Hutchings bore the burden of proof on this point and has failed to carry that burden.[50] There are two types of public figures. The first is an all-purpose public

---

[43] *See, e.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–83 (1964); *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 155 (1967); *id.* at 64 (Warren, C.J., concurring); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Snyder v. Phelps*, 562 U.S. 443, 451–52, 458 (2011).
[44] *Sullivan*, 376 U.S. at 279 (public official); *Curtis Pub. Co.*, 388 U.S. at 64 (Warren, C.J., concurring). In *Curtis*, the majority of the court agreed with Chief Justice Warren that the *Sullivan* standard applied to public figures as well as public officials. *See id.* at 170 (Black, J., concurring); *id.* at 172 (Brennan, J., concurring); *see also Gertz*, 418 U.S. 335–36.
[45] *Sullivan*, 376 U.S. at 280.
[46] *Hepps*, 475 U.S. at 776; *Snyder*, 562 U.S. at 451–52.
[47] *See Hepps*, 475 U.S. at 775–76.
[48] *See Gertz*, 418 U.S. at 347; *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 973 (Utah 1981) (holding a negligence standard satisfied *Gertz*).
[49] Pl.'s Mot. at 22–23.
[50] *Id.*

figure—an individual with "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts."[51] The Supreme Court has cautioned, however, that lower courts should "not lightly assume that a citizen's participation in community and professional affairs render[s] him a public figure for all purposes."[52] Instead, "clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society" is required.[53] Regardless of whether Ms. Hutchings bore the burden of proof on this point,[54] nothing in the evidence before the court suggests that Ms. Shanley is an all-purpose public figure.

In her Motion for Summary Judgment, Ms. Hutchings argued that Ms. Shanley is a public figure because of the number of books Ms. Shanley has published.[55] But that simply is not the standard. No matter how many books Ms. Shanley has published, hers is not a household name.[56] Indeed, Ms. Shanley publishes in a niche genre with a relatively consistent set of fans.[57] The number of publications one has is not itself sufficient to make someone a public figure.

The second type of public figure is a limited-purpose public figure—an individual who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues."[58] The Tenth Circuit applies the following test to determine whether a plaintiff is a limited-purpose public figure:

> First, the court must isolate the specific public controversy related to the defamatory remarks. Next the court should examine the type and extent of the plaintiff's participation in that public controversy to determine whether, under *Gertz*, he has

---

[51] *Gertz*, 418 U.S. at 351.
[52] *Id.* at 352.
[53] *Id.*
[54] *Cf. Wayment v. Clear Channel Broadcasting*, 2005 UT 25, ¶ 25, 116 P.3d 271 (suggesting a defamation defendant must present clear evidence that a plaintiff is an all-purpose public figure).
[55] Def.'s Mot. for Summ. J. 4, 10.
[56] *Cf. Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d 1287, 1294 (D.C. Cir. 1980) (compiling caselaw on what is a public figure).
[57] *See* Shanley Decl. ¶¶ 7–8.
[58] *Gertz*, 418 U.S. at 351.

"thrust [himself] to the forefront of [the] controvers[y] in order to influence the resolution of the issues involved."[59]

Even assuming that there existed such a controversy here, nothing in the record before the court suggests that Ms. Shanley *voluntarily* injected herself into it. Ms. Hutchings' accusations about Ms. Shanley cannot render Ms. Shanley a limited-purpose public figure without any action on the part of Ms. Shanley herself.

Next, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is the subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"[60] In conducting this inquiry, courts must look to the "content, form, and context" of the speech at issue.[61] For instance, in *Snyder v. Phelps*, members of the Westboro Baptist Church had picketed at a soldier's funeral and had displayed such signs as: "God Hates the USA/Thank God for 9/11," "America is Doomed," "Fag Troops," "Thank God for Dead Soldiers," and "Priests Rape Boys" and "You're going to Hell."[62] The Supreme Court held that the content of these signs related to issues of interest to society writ large, since "the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality in the military, and scandals involving the Catholic clergy—are matters

---

[59] *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1136–37 (10th Cir. 2006); *accord Waldbaum*, 627 F.2d at 1296–98 (requiring courts to (1) determine whether a public controversy exists; (2) determine whether the plaintiff voluntarily participated in the public controversy; and (3) determine whether the defamation was germane to the plaintiff's participation in the controversy); *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir. 1984) ("A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.").
[60] *Snyder*, 562 U.S. at 453.
[61] *Id.*
[62] *Id.* at 454.

of public import."[63] And the fact that these signs were displayed in the context of a soldier's funeral did not render them matters of private concern.[64]

This case is a far cry from *Snyder*. Ms. Shanley has presented evidence that Ms. Hutchings made a barrage of social media posts accusing Ms. Shanley of reprehensible and illegal conduct. While discussion of the issues of rape, child sexual abuse, and human trafficking are undoubtedly matters of public concern, these posts were not directed at such matters. The content of these posts makes clear that they were personal attacks, not general comments on issues of public debate. For instance, had Ms. Hutchings voiced her opinions on child sexual abuse generally, her comments may have indeed been those of public concern. But instead, Ms. Hutchings specifically accused Ms. Shanley of rape and child sexual abuse.[65] Such posts are not directed to matters of public concern. And the form and context of the posts do not render this private matter one of public concern—simply posting on publicly viewable social media cannot transform the content of speech into that of public import.

In sum, the court concludes that the heightened standard for public figures and matters of public concern does not apply to Ms. Shanley's claims. The court proceeds to determine whether Ms. Shanley has met her burden in proving that there is no dispute of material fact and that she is entitled to judgment as a matter of law on each of her claims.

## II.     Defamation and Defamation Per Se

To prove a claim for defamation, Ms. Shanley must prove that Ms. Hutchings' statements were: (1) published either in print or orally; (2) false and defamatory; (3) not subject to privilege;

---

[63] *Id.* at 454.
[64] *Id.* at 454–55.
[65] *See* sources cited *supra* notes 8–9.

(4) published with the requisite degree of fault; and (5) resulted in damages.[66] Ms. Shanley seeks summary judgment on both her claim for defamation and her claim for defamation per se. Since the torts differ only on the fifth element—damages—the court analyzes them together.

### A. Publication by Ms. Hutchings

In order to prevail, Ms. Shanley must prove that Ms. Hutchings "published" her statements either in print or orally. She has done so.

For starters, there is no genuine dispute of material fact that it was indeed Ms. Hutchings that generated the posts at issue. The posts appeared on accounts Ms. Hutchings admitted belong to her, which use aliases she admits to using.[67] And indeed, Ms. Hutchings admitted to generating a number of the posts at issue.[68]

And likewise, there is no genuine dispute of material fact that Ms. Hutchings "published" her statements. "The requirement of 'publication' means that the defamatory statement be communicated to a third person and that the third person read and understand the statement."[69] Ms. Hutchings made hundreds of posts on her publicly accessible social media accounts.[70] Those accounts had several thousand followers at the time the posts were made.[71] And further, Ms. Shanley has presented evidence of third-parties commenting on Ms. Hutchings' posts, or contacting her directly in relation to the posts.[72]

---

[66] *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535 (quoting *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 68, 194 P.3d 956; *West v. Thomson Newspapers*, 872 P.2d 999, 1007 (Utah 1994)).
[67] *See* Answer ¶ 4 (admitting Ms. Hutchings uses "Terry Bolryder" and "Domino Savage" as her pennames); *id.* ¶ 15 (admitting Ms. Hutchings used particular social media accounts).
[68] *See supra* note 20 and accompanying text.
[69] *DeBry v. Godbe*, 1999 UT 111, ¶ 23, 992 P.2d 979.
[70] Shanley Decl. ¶¶ 10–12.
[71] *See* ECF No. 64-2, Ex. B (Instagram account with 1,525 followers); *id.* Ex. C (Facebook account with 7,800 followers); Answer ¶ 15 (admitting that Ms. Hutchings' accounts had several thousand followers).
[72] *See* ECF No. 64-2, Ex. M; *id.* Ex. AG; *id.* Ex. AJ; *id.* Ex. AQ; *id.* Ex. AR.

10

Therefore, the court concludes that Ms. Shanley has met her initial burden of proving that there is no genuine dispute of material fact on this element. No reasonable jury could conclude anything other than that Ms. Hutchings published the statements at issue in this case.

### B. False and Defamatory Statements

In order for a statement to be false, it must first be factually based, not merely an opinion. In other words, it must be objectively verifiable as either true or false.[73] However, in Utah, so long as the First Amendment does not require otherwise, "[f]alsity is usually presumed, and truth is an affirmative defense that the defendant bears the burden of proving."[74] Therefore, because Ms. Hutchings has not resisted Ms. Shanley's Motion for Summary Judgment and has not presented any evidence of her own, the court concludes that the falsity of the statements at issue may be presumed.

But even if the First Amendment requires that Ms. Shanley affirmatively prove the falsity of the statements at issue, the court concludes that she has done so. First, many of the statements at issue are capable of being objectively verified as either true or false. Ms. Hutchings accused Ms. Shanley of specific acts—rape, plagiarism, adultery, blackmail, human trafficking, child abuse, child molestation, and others.[75] Indeed, it is telling that Ms. Hutchings even asserted that her accusations were true.[76] Second, Ms. Shanley has presented evidence of the posts' falsity. Ms. Shanley declares: "I have never committed any of the horrific acts that Ms. Hutchings has

---

[73] *Jacob*, 2009 UT 37, ¶ 22; *see also West*, 872 P.2d at 1014 ("Opinions are inherently incapable of verification; they embody ideas, not facts.").

[74] *Pipkin v. Acumen*, 2020 UT App 111, ¶ 16 n.10, 472 P.3d 315; *see also Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57–58 (Utah 1991); *Davison v. Baird*, 2019 UT App 8, ¶ 25 n.3, 438 P.3d 928.

[75] *See* sources cited *supra* notes 8–15.

[76] *E.g.*, ECF No. 64-2, Ex. K.

accused me of in her Social Media Posts,"[77] including rape, rape of a child, child sexual abuse, sex trafficking, adultery, blackmail, sexual coercion, white supremacy, plagiarism, or being abusive.[78] Finally, Ms. Hutchings failed to produce evidence of truth in response to discovery requests by Ms. Shanley.[79]

In her initial Motion for Summary Judgment, Ms. Hutchings argued that she "made true statements based upon available information."[80] She points to a handful of social media posts from others that suggest that Ms. Shanley is a "homewrecker,"[81] that she engaged in plagiarism,[82] and that she was abusive to other female authors and towards book models.[83] Even if this is not inadmissible hearsay,[84] it would only implicate a handful of the allegations Ms. Hutchings made in her posts—the evidence Ms. Hutchings presents does nothing to suggest that Ms. Shanley is in fact a rapist, child molester, white supremacist, or human trafficker. Ms. Hutchings also points to a pair of screenshots showing a text conversation supposedly involving Ms. Shanley.[85] Even had this conversation been properly authenticated,[86] it involves only one variety of the numerous scandalous statements made. The court concludes that Ms. Shanley has

---

[77] Shanley Decl. ¶ 13.

[78] *Id.* ¶¶ 14–23.

[79] *See* Memorandum Decision and Order 2–4, ECF No. 59 (describing discovery issues); *see also* Pls.' First Set of Discovery Requests to Def., ECF No. 35-1; Def Robyn A Hutchings A/K/A Terry Bolryder A/K/A Domino Savage's Response to Pls.' First Set of Document Production Requests, ECF No. 35-2.

[80] Def.'s Mot. for Summ. J. 12.

[81] *See* ECF No. 32-3.

[82] *Id.*

[83] *See* ECF No. 32-5.

[84] *See* Fed. R. Evid. 801 ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); Fed. R. Evid. R. 802 ("Hearsay is not admissible [absent an exception]."); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact [on summary judgment] cannot be presented in a form that would be admissible in evidence.").

[85] *See* ECF No. 32-6.

[86] *Cf.* Fed. R. Evid. 901; Def.'s Affidavit in Support of Mot. for Summ. J., ECF No. 32-7 (stating that "I authenticate the attached exhibits").

met her burden in presenting evidence on which no reasonable jury could conclude that Ms. Hutchings' posts were true.

Turning then to whether the posts were defamatory, the Utah Supreme Court has instructed that courts must "carefully examine the context in which the statement was made" in order to determine whether statements were defamatory, that is, whether statements impeach a plaintiff's "honesty, integrity, virtue, or reputation" and thereby expose the plaintiff "to public hatred, contempt, or ridicule."[87] The court must first determine "that the statement is capable of sustaining such a meaning as a matter of law," and then, the trier of fact must "determine whether the statement was in fact so understood by its audience."[88]

It is not difficult for the court to determine that as a matter of law, many of the posts at issue were capable of exposing Ms. Shanley to public hatred, contempt, and ridicule. Specifically, several posts accuse Ms. Shanley of serious and particularly heinous crimes.[89] Beyond that, Ms. Hutchings directly accused Ms. Shanley of various acts of adultery,[90] plagiarism,[91] and white supremacy.[92] While not criminal, these statements are likewise capable of sustaining a defamatory meaning as a matter of law.[93] And indeed, as a factual matter, at least

---

[87] *Jacob*, 2009 UT 37, ¶¶ 26–27 (quoting *West*, 872 P.2d at 1008).
[88] *West*, 872 P.2d at 1008.
[89] *See* sources cited *supra* notes 8–10.
[90] *See, e.g.*, ECF No. 64-2, Ex. AE.
[91] *See, e.g.*, ECF No. 64-2, Ex. AK.
[92] *See, e.g.*, ECF No. 64-2, Ex. AH.
[93] The court notes that Ms. Shanley has suggested that Ms. Hutchings' allegations of "fan abuse" were defamatory. But this record contains only two posts containing such allegations, and the court is unable to conclude that as a matter of law, those posts exposed Ms. Shanley to hatred, contempt, or ridicule, even in light of the "tight knit" fanbase implicated here.

some of the audience of Ms. Hutchings' posts certainly understood the posts to be factual and to be an attack on Ms. Shanley's character.[94]

However, not all of Ms. Hutchings' statements are verifiable as to truth or falsity or of sustaining a defamatory meaning. In addition to making specific claims of wrongdoing—which the court has concluded are both false and defamatory—Ms. Hutchings engaged in general online harassment.[95] Such posts cannot be either true or false and are not defamatory as a matter of law.

In summary, the court concludes that Ms. Shanley has met her burden in proving that there is no genuine dispute of material fact that a number of Ms. Hutchings' posts were false and defamatory, and that she is entitled to judgment as a matter of law on this element.

### C.  Privilege

There are two general types of privilege recognized under Utah law: conditional privilege or qualified privilege, and absolute privilege.[96] An absolute privilege is the strongest and is extended "to persons whose special position or status requires that they be as free as possible from fear that their actions in their position might subject them to legal action."[97] A conditional or qualified privilege exists when "a defendant seeks to vindicate or further an interest 'regarded as being sufficiently important to justify some latitude for making mistakes[.]"[98] And within these broad categories, a number of more specific privileges exist, such as: the public interest

---

[94] *See* sources cited *supra* note 23; *see also* Shanley Decl. ¶ 43 (describing how Ms. Shanley's fiancé's former mother-in-law sought to limit Ms. Shanley's contact with her fiancé's children as a result of Ms. Hutchings' posts).
[95] *See supra* note 17.
[96] *See Brehany*, 812 P.2d at 58; *O'Connor v. Burningham*, 2007 UT 58, ¶ 29, 165 P.3d 1214; *see also DeBry*, 1999 UT 111, ¶ 10 ("A number of legal privileges are recognized in circumstances where communication must be wholly open, frank, and unchilled by the possibility of a defamation action.").
[97] *O'Connor*, 2007 UT 58, ¶ 29.
[98] *Brehany*, 812 P.2d at 58 (quoting W. Keeton, Prosser and Keeton on the Law of Torts § 115 (5th ed. 1984)).

privilege; the publisher's interest privilege; the police report privilege; the common interest privilege; the family relationships privilege; the fair report privilege; the judicial proceedings privilege; and the legislative proceedings privilege.[99] A plaintiff may overcome a conditional or qualified privilege by showing actual malice on the part of the defendant.[100]

Ms. Shanley argues that Ms. Hutchings bears the burden of proving the existence of a privilege and that she has not done so.[101] Utah courts have indeed characterized the existence of a privilege on a defamation claim as "an affirmative defense."[102] And Ms. Hutchings did not respond to the present Motion for Summary Judgment, nor did she raise any such privilege in her Answer.[103]

Even assuming that Ms. Shanley must provide sufficient facts for the court to hold that no privilege exists, the court concludes that she has done so. Ms. Shanley has presented evidence of Ms. Hutchings making numerous disparaging remarks about Ms. Shanley on social media. No privilege is implicated here.[104]

---

[99] *See* CV 1608 Conditional Privilege Committee Notes, <u>Model Utah Jury Instructions, Second Edition (MUJI 2d)</u>, https://legacy.utcourts.gov/muji/?cat=1&subcat=16 [https://perma.cc/4PP7-5X2P] (compiling caselaw) (last visited Feb. 5, 2024).

[100] *See Jacob*, 2009 UT 37, ¶ 23 ("If a conditional privilege exists, the plaintiff must prove actual malice to overcome it.").

[101] Pls.' Mot. 34.

[102] *Zoumadakis v. Uintah Basin Medical Center, Inc.*, 2005 UT App 325, ¶ 6, 122 P.3d 891 (citing *Brehany*, 812 P.2d at 58–59).

[103] *See* Defendant's Affirmative Defenses, ECF No. 17.

[104] *Cf., e.g., Jacob*, 2009 UT 37, ¶ 24 ("[The public interest] privilege applies 'when there is a legitimate issue with respect to the functioning of governmental bodies, officials, or public institutions, or with respect to matters involving the expenditure of public funds."); *Brehany*, 812 P.2d at 58 (noting that the publisher interest privilege applies to protect a legitimate interest of the publisher, the recipient, or a third party, such as in cases involving employee termination); *Murphree v. US Bank of Utah, N.A.*, 293 F.3d 1220, 1223 (10th Cir. 2002) (predicting that Utah would recognize immunity for "an individual reporting suspected criminal conduct to police authority"); *Lind v. Lynch*, 665 P.2d 1276, 1279 ("[C]ommunications between persons who share a common business interest are qualifiedly privileged and not libelous in the absence of malice."); *O'Connor*, 165 P.3d at 1223–24 (outlining the family relationships privilege); *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896, 900 (Utah 1992) ("For a statement to qualify for [the fair report privilege], it must fulfill the following elements: It must be a report of a judicial, legislative, or other public official proceeding or of anything said in the course thereof or of a charge or

Therefore, the court concludes that Ms. Shanley has met her burden in showing that no genuine dispute of material fact exists and that she is entitled to judgment as a matter of law on the privilege element.

### D. Fault

Because the court has concluded that the First Amendment does not here impose additional protections on Ms. Hutchings' statements, and because no privilege exists, Ms. Shanley must prove only that Ms. Hutchings acted at least negligently.[105] The Utah Supreme Court has adopted the Restatement (Second) of Torts' view on which "evidentiary standards [are] to be employed in determining how negligence is proved" in cases such as this: The question is "whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it."[106]

The evidence in this case overwhelmingly supports a finding that Ms. Hutchings acted at least negligently. Ms. Shanley has presented evidence of *hundreds* of posts on social media accusing her of various crimes and disreputable acts.[107] As noted earlier, Ms. Hutchings explicitly or implicitly accused Ms. Shanley of rape, child molestation, and human trafficking a

---

complaint upon which a warrant shall have been issued or an arrest made; it must be a fair and true report of the proceeding or charge; it must be made without malice."); *West*, 872 P.2d at 1012 ("[F]or the fair comment privilege to apply, the allegedly defamatory statement must be an opinion based upon true or privileged assertions of fact."); *O'Connor*, 165 P.3d at 1222–23 ("The judicial proceeding privilege has three elements. First, the alleged defamatory statement must have been made during or in the course of a judicial proceeding. Second, the statement must have some reference to the proceeding's subject matter. Third, the party claiming the privilege must have been acting in the capacity of a judge, juror, witness, litigant, or counsel in the proceeding at the time of the alleged defamation."); *Riddle v. Perry*, 2002 UT 10, ¶ 11, 40 P.3d 1128 (outlining the legislative witness privilege); *Tetra Fin. Grp., LLC v. Cell Tech Intern. Inc.*, No. 2:08-cv-935 TS, 2011 WL 1749069, *2 (D. Utah May 6, 2011) (predicting that Utah would adopt the public interest privilege, which requires that there be "information that affects a sufficiently important public interest," and that "interest requires communication of the defamatory matter to a public officer or private citizen who is authorized or privileged to take action if the defamatory matter is true." (quoting Restatement (Second) of Torts § 598 (Am. L. Inst. 1965)).

[105] *See Seegmiller*, 626 P.2d at 973.
[106] *Id.* at 976 (quoting Rest. 2d Torts § 580B, cmt. g).
[107] *See* Shanley Decl. ¶ 12.

number of times.[108] These are not allegations a reasonable person makes without first confirming the truth of the statement.

Ms. Hutchings argued in her previous Motion for Summary Judgment that her statements reflect her personal belief in the truth of what she was posting.[109] But that is not the standard. Even if it is true that Ms. Hutchings saw other comments online about Ms. Shanley that suggested to her that Ms. Shanley had committed certain acts,[110] and even if Ms. Hutchings personally believed those other posts to be true, a reasonable person would have taken steps to confirm the veracity of these other posts online before repeating, expanding, and professing the supposed truth of those statements online. Thus, even if Ms. Hutchings personally believed that what she was saying was true, she was negligent in repeating it without confirming that it was true.

Therefore, the court concludes that Ms. Shanley has demonstrated that there is no genuine dispute of material fact and that she is entitled to judgment as a matter of law on the fault element.

### E.  Damages

In order to prevail on a defamation claim, the plaintiff must either prove special damages or establish that damages can be presumed.[111] In other words, defamation per se permits recovery of general damages—damages that "naturally and necessarily result from the harm

---

[108] *See* sources cited *supra* notes 8–10.

[109] Def.'s Mot. for Summ. J. 4; *id.* 5 ("But the defendant's statements, included in the complaint, show no evidence that the defendant spoke anything other than the truth, or what she considered to be the truth based on reasonable evidence.").

[110] *Cf.* David S. Hendrick's Affidavit in Support of Defendant Robyn Hutchings' Mot. for Summ. J. ¶¶ 3–8, ECF No. 32-8.

[111] *Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 22, 340 P.3d 183 (citing *Western States Title Ins. Co. v. Warnock*, 415 P.2d 316 (Utah 1966)).

done," "which everyone knows are likely to result from the harm described."[112] However, absent a claim for defamation per se, a plaintiff must prove special damages—damages that "occur as a natural consequence of the harm done but [which] are not so certain to flow therefrom as to be implied in law."[113] The court begins with whether Ms. Shanley's damages are presumed by law.

### 1. Defamation Per Se

Defamation per se consists of defamatory words that are "of such common notoriety that damage can be presumed from the words alone."[114] These must fall into one of several categories, including "the defamatory words must charge criminal conduct, loathsome disease, conduct that is incompatible with the exercise of a lawful business, trade, profession, or office," or sexual misconduct.[115]

First, Ms. Shanley argues that Ms. Hutchings' comments implicate the first category—a charge of criminal conduct.[116] Rape,[117] rape of a child,[118] child sexual abuse,[119] and human trafficking[120] are, of course, crimes in both Utah and California (the state in which Ms. Shanley resides). Therefore, Ms. Hutchings' statements accusing Ms. Shanley of having committed each of these crimes[121] are plainly defamatory per se.

---

[112] *Cohn v. J.C. Penny Co., Inc.*, 537 P.2d 306, 307 (Utah 1975).
[113] *Id.*
[114] *Baum v. Gillman*, 667 P.2d 41, 43 (Utah 1983); *accord Seegmiller*, 626 P.2d at 977 n.7 (noting that per se defamation requires "words specifically directed at the person claiming injury, which words must, on their face, and without the aid of intrinsic proof, be unmistakably recognized as injurious").
[115] *Baum*, 667 P.2d at 43. The Utah Supreme Court has not elucidated whether these categories are exclusive, or whether they might be added to, *see Jacob*, 2009 UT 37, ¶ 26. That issue need not be reached because Ms. Hutchings' words fall into several of the existing categories.
[116] Pls.' Mot. 39.
[117] *See* Utah Code § 76-5-402; Cal. Penal Code § 261.
[118] *See* Utah Code § 76-5-402.1; Cal. Penal Code § 261.5.
[119] *See* Utah Code § 76-5-404.1(2)(a); Cal. Penal Code § 288.
[120] *See* Utah Code § 76-5-308.5; Cal. Penal Code § 236.1.
[121] *See* sources cited *supra* notes 8–10.

Ms. Shanley next argues that Ms. Hutchings' allegations of plagiarism and "fan abuse" were defamatory per se, under the third category—"conduct that is incompatible with the exercise of a lawful business, trade, profession, or office."[122] Ms. Shanley cites to a case from the Northern District of Illinois, applying Illinois law, and a case from the Connecticut Court of Appeals, applying Connecticut law, for the proposition that plagiarism is defamatory per se.[123] But Illinois applies a broader test: "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties."[124] And the Connecticut court did not reach this issue.[125] Ms. Shanley does not cite any case applying Utah law considering whether an allegation of plagiarism is defamatory per se.[126] The test used in Utah requires that the conduct be incompatible with the *lawful* exercise of a given business or profession. And Ms. Shanley does not provide any authority under Utah law indicating that plagiarism is unlawful.

Finally, Ms. Shanley argues that Ms. Hutchings committed defamation per se by accusing her of "cheating and husband stealing," and the like.[127] These posts plainly fall within the fourth category—comments suggesting sexual misconduct.

In sum, a number of Ms. Hutchings' statements on social media constitute defamation per se, as they charge Ms. Shanley with a crime or suggest that she engaged in sexual misconduct. No reasonable jury could hold otherwise.

---

[122] Pls.' Mot. 39.
[123] *Id.* (citing *Mullen v. Soc'y of Stage Dirs. & Choreographers*, 2007 WL 2892654, * 5 (N.D. Ill. Sept. 30, 2007); *Abdelsayed v. Narumanchi*, 668 A.2d 378 (Conn. Ct. App. 1995)).
[124] *Mullen*, 2007 WL 2892654, *5.
[125] *Abdelsayed*, 668 A.2d at 381–82.
[126] *Cf. Nunes v. Rushton*, 299 F.Supp.3d 1216, 1234 (D. Utah 2018) (holding defamation per se claim for plagiarism among other things failed because statements were constitutionally protected).
[127] Pls.' Mot. 40–41.

### 2.  Special Damages

Alternatively, and for the remainder of Ms. Hutchings' statements that do not constitute defamation per se, Ms. Shanley argues that she has actually been damaged.

First, Ms. Shanley presents evidence that suggests that her average monthly income was reduced following the onset of Ms. Hutchings' posts, alongside an affidavit of the average number of hours she states that she worked per month during each period.[128] Ms. Shanley supplements this with evidence of her books falling on Amazon's rankings.[129] Indeed, in several of the social media threads presented, some fans assert that they will no longer purchase Ms. Shanley's books given the accusations.[130] Finally, Ms. Shanley presents evidence of the costs of mental health counseling she has incurred as a result of Ms. Hutchings' posts.[131]

While it is not possible to precisely pinpoint which of Ms. Hutchings' posts caused Ms. Shanley the most damage, there is no genuine dispute of material fact that Ms. Hutchings' false and defamatory posts—taken as a whole—have damaged Ms. Shanley.

### III.   Injurious Falsehood

In order to prevail on the trade libel variety of an injurious falsehood claim,[132] a plaintiff must prove: (1) disparagement or depreciation of the quality of the plaintiff's product; (2) falsity of the statements made; (3) fault; and (4) special damages.[133] While injurious falsehood parallels

---

[128] *See* Shanley Decl. ¶¶ 25–27, 33–36.

[129] *Id.* ¶ 38–39.

[130] *See, e.g.*, ECF No. 64-2, Ex. AQ.

[131] *See* Shanley Decl. ¶ 41.

[132] *See* CV 1901, <u>MUJI 2d</u>, https://legacy.utcourts.gov/muji/?cat=1&subcat=19 [https://perma.cc/F6QH-MVMG] (last visited Feb. 5, 2024) ("The tort of injurious falsehood encompasses two related claims known at common law as 'slander of title' and 'trade libel.'").

[133] *Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040, 1042 (Utah 1975), *overruled in later appeal* 572 P.2d 692; *see also Direct Import Buyers Ass'n v. KSL, Inc.*, 572 P.2d 692, 694 (Utah 1977) ("In case of words falsely broadcast relating to the quality of an article that is made, produced, furnished, or sold by a person, no action will lie unless special damages are alleged, and no recovery can be had unless such special damages are proved.

defamation, it is distinct in that it "protect[s] separate and unrelated interests"; it is a business tort, not a personal tort.[134]

Ms. Shanley argues that "Ms. Hutchings' accusations of plagiarism and fan abuse" are false and disparage Ms. Shanley's chosen profession as a writer.[135] Next, she argues that "[t]he remainder of Ms. Hutchings' falsehoods, such as her false accusations of infidelity, white supremacy, and heinous crimes, further serve to alienate Ms. Shanley from readers by marking Ms. Shanley as a grossly immoral person whose works should not be supported."[136]

To the extent Ms. Shanley seeks to recover for the general allegations of reprehensible conduct, her proper remedy lies in her defamation claim—each of those statements is unrelated to the disparagement of Ms. Shanley's or Wicked Willows' products. Instead, they are personal reputational attacks against Ms. Shanley. And the court has already held that summary judgment in her favor is appropriate on those statements. Likewise, Ms. Hutchings' allegations of "fan abuse" do not disparage a product, and therefore cannot be the proper basis of an injurious falsehood claim. Ms. Shanley has not presented any evidence that Ms. Hutchings alleged that any specific book was plagiarized. Instead, she made broad assertions that Ms. Shanley had plagiarized another author's work. Thus, while the court leaves open the possibility that a false accusation of plagiarism made with the proper mental state could give rise to an injurious falsehood claim, in this case, it appears that the proper remedy is in defamation.

---

Furthermore, the burden is on the plaintiff in such a case to prove that the product is not represented by the defendant but is in fact as the plaintiff claims it to be."). To the extent that Ms. Shanley seeks recovery for publication of a false and defamatory statement "disparaging [her] trade or business," *see* Pls.' Mot. 41, the court concludes that defamation provides the proper remedy.

[134] *See Bass v. Planned Mgmt. Servs., Inc.*, 761 P.2d 566, 568 (Utah 1988) (describing slander of title).
[135] Pls.' Mot. 41.
[136] *Id.* at 41–42.

Thus, because Ms. Shanley has not shown that she is entitled to judgment as a matter of law, the court denies summary judgment on this claim.

## IV.    False Light

The tort of false light is closely related, but not identical, to the tort of defamation.[137] To prove her claim for false light, Ms. Shanley must prove that: (1) Ms. Hutchings "publicized a matter concerning" Ms. Shanley that placed her "before the public in a false light"; (2) "the false light in which" Ms. Shanley "was placed would be highly offensive to a reasonable person"; and (3) the defendant knew or recklessly disregarded the falsity of the publicized matter and the false light in which the plaintiff was placed."[138] The key differences between false light and defamation are that false light requires that information be publicized "more widely" than is required for defamation, and that false light requires "highly offensive," but not necessarily defamatory, statements.[139] However, it is possible that false light and defamation may turn on the same operative facts.[140]

First Ms. Hutchings' statements were plainly publicized to a wide audience, since they were published on publicly viewable social media on accounts with thousands of followers.[141] Second, given that the court has already concluded that a number of Ms. Hutchings' statements were defamatory, those statements necessarily also cast Ms. Shanley in a highly offensive false light.

---

[137] *See Jacob*, 2009 UT 37, ¶ 21; *Jensen v. Sawyers*, 2005 UT 81, ¶ 49, 130 P.3d 325.
[138] *Jacob*, 2009 UT 37, ¶ 21.
[139] *Jensen*, 2005 UT 81, ¶ 49.
[140] *Id.* ¶ 53.
[141] *See* sources cited *supra* note 22.

Third, Ms. Shanley argues that Ms. Hutchings knew or recklessly disregarded the falsity of her statements.[142] The Utah Supreme Court has clarified "[t]o prove knowledge of falsity, a plaintiff must present evidence that shows the defendant knows the . . . statement was untrue."[143] Next, the recklessness standard in this context requires proof that the defendant was aware of the probable falsity of his or her statements or had a serious doubt as to the truth of the statements.[144] However, recklessness may be found even where a defendant had an honest belief of the truth of his or her statements if the defendant's statements "are so inherently improbable that only a reckless man would have put them into circulation" or if "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[145] However, recklessness may not be inferred simply "from personal animosity or hatred."[146]

Ms. Shanley has presented some evidence that suggests Ms. Hutchings did not have an honest belief in the truth of her statements. For instance, Ms. Hutchings stated that she had "been planning this for years."[147] However, that statement follows directly after a post in which Ms. Hutchings states: "I left even more proof everywhere."[148] Therefore, given Ms. Hutchings' repeated assertions that she had proof and that her accusations were true,[149] and given the absence of sufficient evidence to suggest that Ms. Hutchings was aware of the probable falsity of her statements, the court cannot conclude that Ms. Shanley has demonstrated that there is no

---

[142] Pls.' Mot. 44.
[143] *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 30, 221 P.3d 205.
[144] *Id.*
[145] *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).
[146] *Cox v. Hatch*, 761 P.2d 556, 559 n.3 (Utah 1988) (citing *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970)).
[147] ECF No. 64-2, Ex. D.
[148] *Id.*
[149] *See* sources cited *supra* note 16.

genuine dispute of material fact on this issue. And even if Ms. Shanley has carried her initial

burden, the court concludes that the evidence Ms. Hutchings submitted in her Motion is

sufficient to create a genuine dispute of material fact. Ms. Hutchings declared that she acted

under the belief that her statements were true,[150] and she has presented some limited evidence

that could support why she may have thought that at least some of her statements were true.

Additionally, Ms. Shanley has made no argument to suggest that Ms. Hutchings' statements were

so inherently improbable that no reasonable person would have believed them. Finally, Ms.

Shanley seems to suggest that Ms. Hutchings acted recklessly because she had a "desire to ruin

Ms. Shanley's reputation."[151] But again, the court cannot presume reckless disregard for falsity

simply based on personal animosity or hatred.

The court therefore concludes a reasonable jury could decide this issue either way.

Accordingly, it denies summary judgment on this claim.

## V.    Tortious Interference

Broadly speaking, "[d]riving away an individual's existing or potential customers is the

archetypical injury [tortious interference] was devised to remedy."[152] The elements of tortious

interference under Utah law are: (1) intentional interference with existing or potential economic

relations, (2) by improper means, (3) which causes injury to the plaintiff.[153]

The second element—improper means—requires that the plaintiff prove "that the

defendant's means of interference were contrary to statutory, regulatory, or common law or

---

[150] Robyn Hutchings' Aff. in Support of Def. Robyn Hutchings' Mot. for Summ. J. ¶ 4, ECF No. 32-7.
[151] Pls.' Mot. 44.
[152] *Leigh Furniture*, 657 P.2d at 306.
[153] *Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 71, 416 P.3d 401.

violated an established standard of a trade or profession."[154] Such improper means include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood."[155] Because the court has already concluded that Ms. Shanley was defamed by Ms. Hutchings, the second element is plainly satisfied.

Thus, the only issues warranting consideration are whether Ms. Hutchings intended to interfere with Ms. Shanley's current or prospective economic relations and whether Ms. Shanley has proved damages on this claim. "Intent" means that the defendant must have "desire[d] to bring about" an interference with the plaintiff's economic relationships.[156] Interference with present economic relationships requires proof that the defendant "causes one of the parties not to perform on [a] contract," while interference with prospective economic relationships requires proof that the defendant essentially prevented a contract from being formed that was substantially likely to be formed.[157]

Regarding intent, Ms. Shanley has presented evidence that Ms. Hutchings sought to ruin Ms. Shanley's reputation,[158] and that at least one motive of her posts was to discourage readers from purchasing Ms. Shanley's books.[159] However, while there is some evidence that Ms. Shanley had longtime readers and that Ms. Hutchings interfered with those relationships,[160] Ms. Shanley has not presented sufficient evidence of those relationships that would compel a jury to

---

[154] *Id.* (quoting *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323).

[155] *Overstock.com, Inc. v. Smart Bargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858 (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991)).

[156] *Id.*

[157] *St. Benedict's Dev. Co.*, 811 P.2d at 201 (citing Rest. 2d Torts § 766); *see also* Rest. 2d Torts § 766B ("[I]nterference with a continuing business or other customary relationship not amounting to a formal contract [is also included in the term prospective economic relations].").

[158] ECF No. 64-2, Ex. V.

[159] *See id.* Ex. AQ.

[160] *See* Shanley Decl. ¶ 24 ("Many of my readers are repeat customers who have bought several of my books, and repeat customers are a key component to my revenue."); ECF No. 64-2, Ex. AQ.

conclude that Ms. Hutchings' posts interfered with such relationships. The record is silent as to how many longtime readers Ms. Shanley had, and how many of those longtime readers stopped purchasing Ms. Shanley's books following Ms. Hutchings' posts. Relatedly, because there is not sufficient evidence in the record detailing the prospective economic relationships Ms. Hutchings supposedly interfered with, it is impossible for the court to determine damages from such interference.

In other words, while there is some evidence to suggest that Ms. Hutchings interfered with Ms. Shanley's prospective economic relationships, and that she did so intentionally through improper means, a reasonable jury would not be compelled to reach this conclusion. Neither would the jury be able to sufficiently calculate damages from this record. Thus, summary judgment is improper on this claim.

## VI.     Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress under Utah law are: (1) intentional outrageous or intolerable conduct on the part of the defendant that offends generally accepted standards of decency and morality; (2) the defendant acted with the purpose of causing emotional distress, or acted where any reasonable person would have known that emotional distress would result; (3) the plaintiff actually suffered severe emotional distress; and (4) the defendant's conduct proximately caused the emotional distress.[161] In addition, the Utah Supreme Court has held that "where an emotional distress claim is based on the same facts as a claim for

---

[161] *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 37, 56 P.3d 524 (quoting *Retherford v. AT & T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 970–71 (Utah 1992)); *Carlton v. Brown*, 2014 UT 6, ¶ 50, 323 P.3d 571 (quoting *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 55, 116 P.3d 323); *see also Russell v. Thomson Newspapers*, 842 P.2d 896, 905 (Utah 1992); *Oman*, 2008 UT 70, ¶ 51.

defamation, . . . [a] plaintiff must show negligence as to the falsity of the publication . . . to establish a claim of intentional infliction of emotional distress."[162]

First, conduct is outrageous if it "evokes '"outrage or revulsion; it must be more than unreasonable, unkind, or unfair."'"[163] And "conduct is not outrageous simply because it is '"tortious, injurious, or malicious, or because it would give rise to punitive damages, or because it is illegal."'"[164] Likewise, liability "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."[165] The Restatement (Second) of Torts provides helpful examples of what is, and what is not, sufficiently outrageous conduct.[166] While a single instance of insults or threats may not suffice,[167] the Utah Supreme Court has recognized that "a continuous and ongoing pattern of the same may constitute extreme, intolerable, and outrageous conduct and thus result in liability."[168] For instance, in *Cabaness v. Thomas*, the Utah Supreme Court held that a lengthy pattern of insults, profanity, and targeted safety violations in a work environment could be considered outrageous and intolerable.[169]

---

[162] *Russell*, 842 P.2d at 906.

[163] *Prince*, 2002 UT 68, ¶ 38 (quoting *Franco v. Church of Jesus Christ of Latter-Day Saints*, 2001 UT 25, ¶ 28, 21 P.3d 198).

[164] *Id.* (quoting *Franco*, 2001 UT 25, ¶ 28).

[165] *Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 64, 70 P.3d 17 (quoting Rest. 2d Torts § 46 cmt. d).

[166] *See* Rest. 2d Torts § 46, cmt. d.

[167] *Compare id.* § 46, cmt. d ("A makes a telephone call but is unable to get his number. In the course of an altercation with the telephone operator, A calls her a God damned woman, a God damned liar, and says that if he were there he would break her God damned neck. B suffers severe emotional distress, broods of the incident, is unable to sleep, and is made ill. A's conduct, although insulting, is not so outrageous or extreme as to make A liable to B.") *with id.* § 46, cmt. d ("A, the president of an association of rubbish collectors, summons B to a meeting of the association, and in the presence of an intimidating group of associates tells B that B has been collecting rubbish in territory which the association regards as exclusively allocated to one of its members. A demands that B pay over the proceeds of his rubbish collection, and tells B that if he does not do so the association will beat him up, destroy his truck, and put him out of business. B is badly frightened, and suffers severe emotional distress. A is subject to liability to B for his emotional distress, and if it results in illness, A is also subject to liability to B for his illness.").

[168] *Cabaness v. Thomas*, 2010 UT 23, ¶ 38, 232 P.3d 486 (citing *Retherford*, 844 P.2d at 975–76), *abrogated on other grounds* 424 P.3d 897.

[169] *Id.* at ¶¶ 40–45 (holding the trial court erred in granting summary judgment to the defendant).

Here, Ms. Hutchings made hundreds of posts on social media in a two-month span targeting Ms. Shanley.[170] Not only did Ms. Hutchings accuse Ms. Shanley of various crimes,[171] but Ms. Hutchings also insulted, threatened, and apparently sought to goad Ms. Shanley into a confrontation.[172] The volume of the posts, taken together with their content, convinces the court that Ms. Shanley has satisfied her burden in showing that there is no genuine dispute of material fact that Ms. Hutchings' conduct was extreme and outrageous. No reasonable jury could view this pattern of conduct and conclude otherwise.

While Ms. Hutchings did not respond to Ms. Shanley's Motion, in her own previous Motion for Summary Judgment, Ms. Hutchings' only argument to rebut Ms. Shanley's intentional infliction of emotional distress claim was that her "conduct is not outrageous or intolerable because she was telling the truth about the dangerous and intolerable behavior of someone else."[173] But the court has already concluded that no reasonable jury could find that the bulk of Ms. Hutchings' allegations were true. And either way, a number of Ms. Hutchings' posts were not factual assertions—they were threats and insults.

Second, the most recent pronouncements from the Utah Supreme Court on the second element suggest that liability for intentional infliction of emotional distress may lie not only when the defendant acts "with the purpose of inflicting emotional distress," but also when "any reasonable person would have known that [emotional distress] would result."[174] The court has no trouble in concluding that Ms. Shanley has met her burden here. At the very least, any reasonable

---

[170] *See* sources cited *supra* notes 6–7.
[171] *See, e.g.*, sources cited *supra* notes 8–10.
[172] *See, e.g.*, sources cited *supra* notes 17–18.
[173] Def.'s Mot. 10.
[174] *Carlton*, 2014 UT 6, ¶ 50 (quoting *Anderson Dev. Co.*, 2005 UT 36, ¶ 55).

person would have known that both the content and frequency of Ms. Hutchings' posts likely would cause severe emotional distress. But even if purpose or reckless disregard is the correct standard,[175] the court concludes that it is satisfied here. Again, a number of Ms. Hutchings' posts were plainly intended to goad Ms. Shanley by causing her emotional distress.[176] These posts suggest that Ms. Hutchings' purpose in making many or all her posts was at least in part to cause Ms. Shanley emotional distress.

Finally, the court also concludes that Ms. Shanley has presented sufficient evidence to carry her burden on the third and fourth elements. "The emotional distress a plaintiff experiences must be 'so severe that no reasonable [person] could be expected to endure it,' which 'includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea.'"[177] Ms. Shanley declares that she began to worry about her personal safety at home and in public; that she contemplated suicide following the onset of the posts, and that she began visiting a therapist following the onset of the posts.[178] And it is clear from Ms. Shanley's declaration that her severe emotional distress was a direct and foreseeable result of Ms. Hutchings' posts.

Therefore, the court concludes that Ms. Shanley has presented sufficient evidence on each element of intentional infliction of emotional distress to carry her burden of showing that there is no genuine dispute of material fact and that she is entitled to judgment as a matter of law.

---

[175] *Cf. Prince*, 2002 UT 68, ¶ 37.
[176] *See, e.g.*, ECF No. 64-2, Ex. I; *id.* Ex. J.; Ex. R; *id.* Ex. U; *id.* Ex. W.
[177] *Linebaugh v. Gibson*, 2020 UT App 108, ¶ 43, 471 P.3d 835 (quoting *In re Estate of Grimm*, 784 P.2d 1238, 1246 (Utah Ct. App. 1989)).
[178] Shanley Decl. ¶¶ 30, 40, 41.

**ORDER**

Accordingly, the court GRANTS Ms. Shanley summary judgment on her defamation, defamation per se, and intentional infliction of emotional distress claims, and DENIES Ms. Shanley summary judgment on her injurious falsehood, false light, and tortious interference claims. The court has determined that further proceedings are required on the issue of the calculation and amount of damages.

Signed February 8, 2024.

BY THE COURT

David Barlow
United States District Judge